IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CEDRICK Q. MCCANE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-CV-99-JHP |
| ) | |
| THE WEYERHAEUSER COMPANY, ) | |
| ) | |
| Defendant.. ) | |

# ORDER

Now before the Court is Defendant's Motion for Summary Judgment, Plaintiff's Response to said motion and Defendant's Reply. Defendant moves this Court to dismiss Plaintiff's action against it pursuant to Fed. R. Civ. P. 56. Plaintiff alleges he was subjected to wrongful discharge based upon his race, a racially hostile work environment, and retaliation. Plaintiff brings each of these causes of action pursuant to both Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and 42 U.S.C. §1981.

**BACKGROUND**

Plaintiff is an African American male. Plaintiff became employed with the defendant, Weyerhaeuser Company, in the Spring of 1977. At that time, his position was governed by the terms of the Labor Agreement between Weyerhaeuser Company Mid-South Wood Products and Woodworkers District W-2 International Association of Machinists and Aerospace Workers and its Local Lodge W15 ("Labor Agreement").

Plaintiff became shop steward at the Wright City plywood mill in about 2001.[1] In that position, he processed grievances arising under the Labor Agreement. During the three to four years

---

[1] The Wright City plywood mill had a "green end" and a "dry end." The bulk of the relevant issues in the instant case occurred in the green end.

Plaintiff was a shop steward, he recalls processing three grievances. One involved Raymond Butler, an African American, in a grievance which involved race; the others did not involve race.

The Labor Agreement outlines the steps for a grievance, including the role of the union steward. Any grievance not taken to arbitration is considered settled. Raymond Butler's grievance was lodged October 24, 2003. Because it was not pursued through arbitration, the matter was deemed settled.

In August 2004, the Mill Manager was Richard Murders ("Murders"). Ryan Daniels ("Daniels"), held the position of Manager Trainee, and James Taylor ("Taylor"), held the position of Green End Supervisor. On August 9, 2004, Murders promoted Plaintiff to a salaried supervisor position. Part of Murders' decision to promote Plaintiff was based upon Daniel's positive remarks about Plaintiff. Plaintiff also believes Murders was influenced by the recommendation of Taylor. Murders testified he promoted Plaintiff because he thought he had good leadership skills. As a result of this promotion, Plaintiff's salary increased approximately $22,000 annually. Once a supervisor, Plaintiff's job was no longer governed by the Labor Agreement.

On or about September 2, 2004, within a month of being made supervisor, Plaintiff was accused of sexual harassment by one of his female employees. After an investigation, Plaintiff was coached and counseled on the alleged harassment. Plaintiff testified he did not doubt the woman accused him of harassment, and that he understood the Weyerhaeuser policy was strict in regard to harassment.

Christopher Andrews, Human Relations Manager, conducted the investigation. Plaintiff testified he does not believe Andrews is a racist. Although not all coaching and counseling, or disciplinary sessions with salaried personnel, result in documents signed by the offending employee, in this instance a memo was prepared, and Plaintiff signed the memo September 2, 2004.

Two months later, Plaintiff was again accused of harassment by a different female employee. As a result, an investigation was again conducted by the Human Relations Department. Brooks Burton, Regional Human Relations Manager, conducted this second investigation. Plaintiff testified he does not believe Burton is a racist. As a result of this investigation, on or about November 3, 2004, Plaintiff had a coaching and counseling session with Murders and Taylor and was temporarily moved to another shift as a disciplinary action. Again, a memo was prepared detailing the expectations management had for Plaintiff to resolve the problems he had created and Plaintiff signed the memo on November 3, 2004.

All supervisors undergo an annual performance management process evaluation. On or about January 12, 2005, Murders and Taylor met with Plaintiff to discuss Plaintiff's annual evaluation. Plaintiff received a rating of .222, which is below expectations.

Daniels took over the Green End Coordinator position from Taylor in February 2005. In this position, all four Green End supervisors reported directly to Daniels, including Plaintiff. Because Plaintiff directly reported to Daniels, it was Daniels who conducted counseling sessions and imposed discipline on him thereafter.

On February 2, 2005, Taylor complained to Daniels that Plaintiff had said to him that if Taylor had been doing his job correctly, he would still be the Green End Coordinator. After talking it out with Daniels, Taylor asked that Daniels not confront Plaintiff about this issue, and Daniels honored that request. Daniels testified he honored Taylor's request although it was normally his practice to contemporaneously type up memos of any employee contact he felt reflected possible discipline, or that he felt he might need to remember. Plaintiff testified he believed both Daniels and Taylor were lying about this incident.

In addition to his documented interpersonal skills problems, Plaintiff had documented technical performance problems. The day shift supervisor complained several times about the graveyard shift (Plaintiff's shift) allowing certain vats to get cold, which resulted in mill down time and loss of revenue. This culminated in a written complaint by day shift supervisor Taylor and a counseling session with Plaintiff.

On April 20, 2005, Plaintiff told a group of co-workers that Taylor and Terrell Butler (both African Americans) had been demoted. Terrell Butler overheard this comment and was embarrassed by it. He discussed the issue with his supervisor, Daniels, and requested that Daniels not discipline Plaintiff over the incident. Daniels made a note in his file about the issue and respected Terrell Butler's request that he not discuss the issue with Plaintiff. Plaintiff testified Daniels and Butler were lying about this event.

Plaintiff testified he believes that African Americans Terrell Butler and Taylor lied about Plaintiff's behavior towards them in order to keep their jobs; "if they went against Richard [Murders], Richard probably would have terminated them because he's a racist." With regard to Butler's alleged lie, Plaintiff testified: "African Americans can discriminate against African Americans."

On March 10, 2005, Daniels conducted a coaching and counseling session with Plaintiff

regarding his failure to adequately monitor payroll of his employees. On March 15, 2005, Plaintiff met with Murders and Daniels regarding Murder's concerns about Plaintiff's inadequate incident investigation. Plaintiff agrees that on February 8, 2005, he attended a supervisor meeting where the incident investigation process and training were discussed. Plaintiff was suspended for one day on or about March 23, 2005, as a result of his second failure to conduct a proper safety incident report.

In October 2004, Rina Allen ("Allen"), came to the Mill as a Manager Trainee; in January 2005 she became the Operations Manager. Once she assumed this position, Daniels addressed his personnel issues with her.

In May 2005, Allen officially assumed the position of Mill Manager, and Murders assumed the position of Maintenance Superintendent. At this time, Plaintiff reported to Daniels who reported to Allen. Daniels continued to address personnel issues with Allen.

On April 15, 2005, Daniels showed up at the Mill and observed two union employees not wearing proper personal protective equipment ("PPE"). As Plaintiff was the immediate supervisor of the two union employees, Daniels spoke with him about disciplining the employees. Later on April 15, 2005, Daniels spoke with Allen and they agreed that the failure to wear proper PPE requires a written warning.

Plaintiff was away from the Mill from April 18 through April 21, 2005, at a company-sponsored training entitled "Roadmap for Success Training." On April 20, 2005, Allen noticed that no written warning had yet been issued to the two employees for failing to wear proper PPE. Because the Labor Agreement requires that such discipline be administered within five working days and because Plaintiff was away from the Mill, Allen testified she instructed Daniels to issue the written warning. Daniels issued the written warning to the two employees on April 20, 2005. Although the two employees grieved the issues, they dropped the grievances after the first level.

On April 21, 2005, Plaintiff returned to work and learned about the written warnings. Plaintiff and Daniels spoke that evening on the telephone about the incident. Plaintiff was very angry at Daniels, claiming that Daniels had not told him to issue written warnings and that Daniels undermined his authority by doing it himself. During the course of the very heated conversation, Daniels testified Plaintiff either called him a "liar" or said that he had "lied" to Allen. Daniels took contemporaneous notes of the conversation.

That same evening, Daniels called Allen and related to her the conversation he had with

Plaintiff. Allen and Daniels decided to suspend Plaintiff because of his unacceptable, insubordinate, and rude behavior to his supervisor, Daniels. On Friday, April 22, 2005, Plaintiff was suspended for his behavior pending an investigation. Murders had no knowledge of the suspension until after Plaintiff had been suspended.

On Monday, April 25, 2005, Plaintiff presented his side of the story to Allen and Human Resources Manager Andrews. At this meeting, Plaintiff presented a document purporting to reflect his telephone conversation of April 21, 2005, with Daniels. In it he admits accusing Daniels of lying. Plaintiff remained on suspension pending the outcome of the investigation. After reviewing Plaintiff's work history as a supervisor and hearing the statements of both Daniels and Plaintiff, Allen made the decision to discharge Plaintiff.. Plaintiff does not believe Allen has discriminated against him. Murders had no knowledge that Daniels and Allen had decided to terminate Plaintiff until after the decision had been made.

Plaintiff was discharged on April 28, 2005. In accordance with Weyerhaeuser policy, he received sixty (60) days severance pay. In October 2005, the Mill was closed and remains closed to this day.

## **DISCUSSION**

In general, summary judgment is proper where the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id. at 249.*

In considering a motion for summary judgment, this court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir. 1988). In regard to the necessary burdens, however, the Supreme Court has instructed that:

> in cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the

> "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by their own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Furthermore, if on any part of the prima facie case there is insufficient evidence to require submission of the case to the jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex*, 477 U.S. at 323-24.

Plaintiff's claims are brought under Title VII of the Civil Rights Act as well as under Section 1981. Plaintiff claims wrongful discharge, hostile work environment, and retaliation. In regard to Plaintiff's claim of wrongful discharge, the same approach is used to analyze Title VII and Section 1981 claims. *See Aramburu v. The Boeing co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997); *English v. Colorado Dept. Of Corrections*, 248 F.3d 1002, 1007 (10th Cir. 2001). The Tenth Circuit uses the three-stage analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981), to prove discrimination when no direct evidence of race discrimination exists. *See Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1208 (10th Cir. 1999); *Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1533 (10th Cir. 1995). "At the first stage, the plaintiff must prove a prima facie case of discrimination. A prima facie case of racial discrimination requires a showing "(1) that [the plaintiff] is a member of a racial minority, (2) that [he] suffered an adverse employment action, and (3) that similarly situated employees were treated differently." *Truijillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

If a plaintiff establishes the prima facie case, the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for the challenged employment action. *Reynolds v. School Dist.*

*No. 1*, 69 F.3d at 1533. A plaintiff is then afforded an opportunity to show that the employer's stated reason for the plaintiff's termination was pretextual. *See Richmond v. ONEOK, Inc., 120 F.3d 205, 208 (10th Cir. 1997); Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)*. Plaintiff can establish pretext by showing "either that a discriminatory reason more likely motivated the employer ... or that the employer's proffered explanation is unworthy of credence." *Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)*. Failure to come forward with evidence of pretext will entitle the defendant to judgment. *See Burdine, 450 U.S. at 256; Shorter, 188 F.3d at 1208.*

The Court finds Plaintiff has not presented any evidence Weyerhaeuser's reasons for his discharge were false, that Weyerhaeuser acted contrary to its written policies, or that Weyerhaeuser acted contrary to an unwritten policy or practice. Plaintiff's contention that Weyerhaeuser always applied the most stringent discipline to the union employees for failing to wear PPE as allowed by the Labor Agreement is irrelevant. Weyerhaeuser did have the right to expect its supervisors to do their jobs, including disciplining employees and acting in a professional manner. Weyerhaeuser documented its continuing problems with Plaintiff's performance as a supervisor. Plaintiff has presented no evidence Allen's actions were false or contrary to company policy or practice, or that the decision to terminate him was a pretext for illegal race discrimination.

Even assuming Plaintiff's belief is correct, and Murders (the man whom Plaintiff believes exhibited racial animus) played some role in the decision to discharge him, that assumption does not prove pretext. The uncontroverted record demonstrates it was Murders who was responsible for promoting Plaintiff, over a white employee, less than nine months previously. Weyerhaeuser is entitled to the "same actor" inference adopted by the Tenth Circuit in *Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006)*, wherein the Court stated:

> Most of the same individuals – including Johnson – who decided to terminate Antonio for job abandonment had also hired her twice, fully aware of her race and national origin. It makes little sense to deduce that these individuals terminated Antonio roughly ten months later because of her race and/or national origin. This premise, commonly known as the "same actor inference," has been recognized in varying degrees by nearly every circuit . . . We take this opportunity to join our sister circuits and announce that in cases where "the employee was hired and fired by the same person within a relatively short time span," there is a strong inference that the employer's stated reason for acting

7

against the employee is not pretextual.

If Murders were interested in discriminating against Plaintiff based upon his race, it would make little sense for him to have promoted Plaintiff only nine months earlier. It is Plaintiff's position that Murders' decision to promote him was part of a conspiracy to remove Plaintiff's protection under the Labor Agreement. This conspiracy theory would have to be based upon the assumption Murders was so motivated by racial animus that he was willing to have the company pay an extra $16,500 over nine months in order to fulfill his scheme. Further, the record demonstrates Murders has a history of sponsoring and promoting African Americans. While in a supervisory role at his prior Weyerhaeuser position, five of the six employees Murders promoted into supervisory positions were African Americans. At Wright City, two of the five employees Murders promoted into supervisory positions were African Americans. Finally, Murders' position changed during this time such that he no longer had any supervisory control over Plaintiff. The decision-maker as to the discharge was Allen, not Murders. While Plaintiff may sincerely believe his conspiracy theory, there are no facts to support it.

Plaintiff concedes his claim of hostile work environment asserted pursuant to Title VII as a theory of recovery and relies solely upon §1981. (Plaintiff's Resp. at 29). "Hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the 'unlawful employment practice,' cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103, citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Determining whether an actionable hostile work environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id*. at 23; *Jones v. Barnhart, 349 F.3d 1260, 1268 (10th Cir. 2003).*

In the instant case, Plaintiff admits there were no racially-charged comments made in the workplace. He admits he never felt threatened. Plaintiff admits that nothing happened that impeded his ability to do his job. Plaintiff's claim rests totally upon his feeling that other black employees were the victims of discrimination. Yet, none of the employees who, according to Plaintiff were

victims of racial discrimination while Plaintiff was employed, filed a charge with the EEOC, filed a lawsuit, or even took a grievance through arbitration. Further, Plaintiff did not witness any racially derogatory comments. Not only do these incidents not rise to the level of an objectively hostile environment, the incidents did not subjectively impact Plaintiff as he was able to perform his job. This case does not present facts, even when viewed in Plaintiff's favor, to convince a rational jury "that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Finally, Plaintiff has also abandoned his retaliation claim asserted pursuant to Title VII, and relies solely upon §1981 (Plaintiff's Resp. at 33). The Court finds that even if Plaintiff's version of the facts is accepted as true, there is no evidence that he personally engaged in any protected activity. Filing grievances on behalf of fellow union members was part of his administrative job as steward. There is no evidence that Plaintiff, himself, made any allegations of discrimination, or personally supported any other person's allegations of discrimination.

Assuming the discipline Plaintiff received after he was promoted to supervisor could be construed as an "adverse employment action," it began no earlier than September 2004 while Plaintiff's alleged protected activity occurred in the fall/winter of 2003. Therefore, there were at least eight months between the alleged protected activity and the beginning of the alleged retaliation. This timing alone, will not prove causation. *See e.g., Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181-82 (10th Cir. 2006)(nine months is insufficient); Kendrick v. Penske Transportation Services Inc., 220 F.3d 1220,1234 (10th Cir. 2000)(complaints in 1996 cannot prove causal connection for March 1997 discharge); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(three months insufficient).* Additionally, Allen, the person who discharged Plaintiff, was unaware of any alleged protected activity. Thus, there can be no causal connection. *See Jones v. Barnhart, 349 F.3d 1260 (10th Cir. 2003); Williams v. Rice, 177, 181 (10th Cir. 1993).*

Accordingly, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED** this 22nd day of March, 2007.

James H. Payne
United States District Judge
Eastern District of Oklahoma

9